## IN THE UNITED STATES DISTRICT COURT OF MARYLAND
### BALTIMORE DIVISION

**RON L. LACKS, PERSONAL**
**REPRESENTATIVE OF THE ESTATE OF**
**HENRIETTA LACKS**
5409 Daywalt Avenue
Baltimore, Maryland 21206

      **PLAINTIFF**

VS-

**NOVARTIS PHARMACEUTICALS**
**CORPORATION**,
59 Route 10
East Hanover, New Jersey 07936,

Serve: Corporation Service Company
84 State Street
Boston, MA 02109

**NOVARTIS GENE THERAPIES INC.**
2275 Half Day Road, Suite 203
Bannockburn Illinois 60015,

Serve: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**VIATRIS INC.**
1000 Mylan Blvd.
Canonsburg, PA 15317, and

Serve:The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**MYLAN PHARMACEUTICALS.**
1000 Mylan Blvd.
Canonsburg, PA 15317

Serve: C T Corporation
600 North 2nd Street

Civil Case No.: ___

Suite 401
Harrisburg, Pennsylvania 17101


**DEFENDANTS**

## CIVIL COMPLAINT AND REQUEST FOR JURY TRIAL

Plaintiff Ron L. Lacks, personal representative of the Estate of Henrietta Lacks, by and through his undersigned counsel, brings this Complaint against Defendants Novartis Pharmaceuticals Corporation and Novartis Gene Therapies Inc. (collectively "Novartis"), and Viatris Inc. ("Viatris") and its subsidiary Mylan Pharmaceuticals ("Mylan") and states as follows:

## INTRODUCTION

1.      This case is about multibillion-dollar biopharmaceutical corporations Novartis Pharmaceuticals Corporation, Novartis Gene Therapies Inc., Viatris Inc., and through its associated subsidiary, Mylan Pharmaceuticals (collectively "Defendants"), making conscious choices to commercialize the living genetic material of Henrietta Lacks, a Black woman, grandmother, and community leader, despite the corporations' knowledge that Mrs. Lacks's tissue was taken from her without her consent or knowledge by physicians at Johns Hopkins Hospital. Defendants have reaped massive profits by exploiting Mrs. Lacks's cells as a biological factory to create and patent new drugs.

2.      Medical research has a long, troubled racial history. The exploitation of Henrietta Lacks represents the unfortunately common struggle experienced by Black people throughout

American history. Indeed, Black suffering has fueled innumerable medical progress and profit, without just compensation or recognition. Various documented and undocumented studies have thrived off the dehumanization of Black people.

3.      In the 1950s, a group of white physicians at Johns Hopkins preyed on Black women with cervical cancer. While treating Black women in racially segregated wards, white physicians would cut away tissue samples from their patients' cervixes without their patients' knowledge or consent (informed or otherwise). A leading figure in this unseemly and unlawful practice—Dr. George Gey, then head of tissue culture research at Johns Hopkins—once proclaimed himself "the world's most famous vulture, feeding on human specimens almost constantly."

4.      Tissue samples were not taken for purposes of genuine medical treatment.

5.      Henrietta Lacks was one of the victims of this misconduct. Mrs. Lacks was admitted to the racially segregated ward at Johns Hopkins Hospital—one of the only hospitals that would treat Black patients—for a malignant tumor on her cervix. On February 5, 1951, during a surgical procedure and with her under anesthesia, a white physician at Johns Hopkins used a sharp knife to cut two parts of Mrs. Lacks's cervix away under the guise of treating her cervical cancer with radium. This surgical procedure to harvest Mrs. Lacks's tissue was not medically necessary and was not an operation to which Mrs. Lacks had consented. Nor was she warned about the risks of the aggressive course of treatment she was subjected to, which left her infertile. Months later, when Mrs. Lacks was told that the course of treatment for her cancer had left her infertile, she stated clearly that she would never have agreed to be treated had she been informed of the risk of infertility. Moreover, the "treatment" was completely ineffective. Henrietta Lacks ultimately died of cervical cancer on October 4, 1951.

6.      The cells taken from Henrietta Lacks have unique properties. While most cell samples die shortly after they are removed from the body, Mrs. Lacks's cells survived and reproduced in the laboratory. This exceptional quality meant that it was possible to cultivate Mrs. Lacks's cells into a cell line that could reproduce indefinitely in laboratory conditions—an immortal cell line. Indeed, Mrs. Lacks's cells were the first known immortalized human cell line. Medical researchers refer to Henrietta Lacks's cultivated cell line as the HeLa cell line, using the first letters of Mrs. Lacks's first and last names.

7.      While it was not known for decades to medical researchers outside Johns Hopkins that HeLa cells were Mrs. Lacks's cells, upon information and belief, it was well understood within the scientific community that the cell line was the product of non-therapeutic medical experimentation on Black patients by physicians at Johns Hopkins.

8.      Medical researchers used HeLa cells to develop a huge number of scientific and medical innovations, including the polio vaccine, gene-mapping, in vitro fertilization, and many more. The HeLa cell line is one of the most important and widely used cell lines in human history. But Henrietta Lacks was never told why her tissue was taken and never gave permission for her cells to be used as they have been.

9.      Novartis is a pharmaceutical behemoth that has amassed substantial profits through its use of the HeLa cell line. It owns hundreds of patents developed through use of the HeLa cell line. In leveraging patents, Novartis has utilized Mrs. Lacks's genetic material extensively as a fundamental component in their research and development processes. By using these cells, Novartis can efficiently test and refine their pharmaceutical compounds, accelerating the development of new drugs.

10.     Novartis's cultivation of Mrs. Lacks's cells is despite the fact the company is well aware—and has been at all relevant times—of the wrongful origins of the Hela cell line. Novartis has even acknowledged on its own company's website "the story of Henrietta Lacks, whose cervical cancer cells were surreptitiously commercialized for research purposes without her knowledge."

11.     Novartis has extensively developed and commercialized HeLa cell lines to secure intellectual property rights that underpin its market presence, generating substantial profits that would not have been possible without Henrietta Lacks' cells. Novartis was aware that these cells were taken without consent. Despite this, Novartis never sought or received permission from the Estate of Henrietta Lacks to use her cells, treating them as mere tools or resources.

12.     Viatris, formed through the merger of Mylan Pharmaceuticals and Upjohn, is a global pharmaceutical giant that has capitalized and profited from Mylan Pharmaceuticals' vast drug portfolio developed through its use of HeLa cells.

13.     In creating Mylan's extensive drug portfolio, Mylan, and now Viatris, have heavily relied on Mrs. Lacks's genetic material as a crucial element in their research and development activities. By incorporating these cells, the Defendants can effectively test and enhance their pharmaceutical compounds, expediting the development of new medications.

14.     Defendants' cultivation of Mrs. Lacks's cells is ongoing despite the fact the company is well aware—and has been at all relevant times—of the wrongful origins of the Hela cell line. Viatris' former Chief Executive Officer, Michael Goettler, has previously posted on LinkedIn, acknowledging "it is medically and scientifically fascinating how one woman's cells have been so pivotal in countless #research and contributed to the development of so many

significant drugs…. The experiences of people like Henrietta Lacks … continue to leave emotional wounds in the Black community in the United States."

15.     Viatris and Mylan have extensively researched, developed, and commercialized products using HeLa cell lines, which have been integral to their market presence and profitability. By leveraging the unique properties of HeLa cells for various scientific and pharmaceutical applications, they have been able to accelerate the development and refinement of numerous drugs. These advancements have significantly contributed to their revenue streams. Viatris and Mylan were aware that HeLa cells were originally taken without consent. Despite this, they never sought or received permission from the Estate of Henrietta Lacks to use her cells, treating them as mere tools or resources for their commercial gain.

16.     Defendants' choice to continue utilizing HeLa cells despite the cell lines' origin and the concrete harms it inflicts on the Lacks family can only be understood as a choice to embrace a legacy of racial injustice embedded in the US research and medical systems. Like anyone else, Black people have the right to control their bodies. Yet, the Defendants treat Henrietta Lacks' living cells as mere chattel to be manipulated without regard to the profound detrimental impact on the Lacks family.

17.     Plaintiff brings a single cause of action—for unjust enrichment—against Novartis Pharmaceuticals Corporation, Novartis Gene Therapies Inc., Viatris Inc., and Mylan Pharmaceuticals for their choice to profit from the unlawful conduct of Johns Hopkins' physicians. Under settled law, as articulated in the *Restatement of Restitution, Third,* "a defendant who is enriched by misconduct and who acts with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits. *Restatement (Third) of Restitution and Unjust*

*Enrichment* § 51(3) (2011).  Put simply, because it made the conscious choice to profit from the assault of Henrietta Lacks, Novartis's ill-gotten gains rightfully belong to Mrs. Lacks's Estate.

## PARTIES

18.     Henrietta Lacks was a natural person, resident of Baltimore County, Maryland, and citizen of the state of Maryland. The executor and personal representative of Mrs. Lacks's Estate is Ron L. Lacks, Mrs. Lacks's grandson. Mrs. Lacks is a natural person, resident of Baltimore County, Maryland, and citizen of the state of Maryland.

19.     Novartis Pharmaceuticals Corporation is incorporated under the laws of the State of Delaware. It is headquartered in East Hanover, New Jersey. As used in this complaint, "Novartis" refers both to Pharmaceuticals Corporation. and to its subsidiaries, affiliates, agents, and other entities within its control that have owned, manufactured, distributed, monitored, or sold HeLa cells or related products. Novartis registered to do business in Maryland on March 20, 1997. Novartis's Maryland registration was forfeited for failure to file a property return for 2018.

20.     Novartis Pharmaceuticals Corporation is responsible for the development, manufacturing, and marketing of Novartis's parent company's prescription medications within the United States.

21.     Novartis Gene Therapies, Inc. is incorporated under the laws of the State of Delaware. It is headquartered in Bannockburn, Illinois. It has never been registered to do business in Maryland.

22.     Novartis's parent company is traded on the New York Stock Exchange. It has a market capitalization of $215 billion. In 2023, Novartis's parent company disclosed in its year-end report that net sales totaled $45.4 billion.

23.     Viatris Inc. is a Delaware corporation headquartered in Canonsburg, Pennsylvania
As used in this complaint, "Viatris" refers both to Viatris Inc. and to its subsidiaries, affiliates,
agents, and other entities within its control that have owned, manufactured, distributed, monitored,
or sold HeLa cells or related products

24.     Viatris Inc. is responsible for the development, manufacturing, and marketing of
prescription medications within the United States. It has never been registered to do business in
Maryland.

25.     Viatris was formed through the merger of Mylan Pharmaceuticals and Upjohn.
Through this process, Mylan Pharmaceuticals ceased to be an independent entity and was
effectively absorbed into Viatris, becoming a subsidiary under its control.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. § 1332, based upon diversity of citizenship in that Plaintiff is not from the same state as the
Defendant, and the amount in controversy exceeds $75,000.

27.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or
omissions giving rise to Plaintiff's claims occurred in this District.

28.     Novartis recruits patients and conducts clinical trials in Maryland. According to
clinicaltrials.gov, Novartis has conducted or is conducting 291 clinical trials with locations in
Maryland. Novartis offers Health Economics & Outcomes Research (HEOR) and Medical Access
Fellowship positions at the University of Maryland, Department of Pharmaceutical Health
Services Research in Baltimore, Maryland. Novartis Gene Therapies likewise conducts clinical
trials in Maryland.

29.     Novartis Gene Therapies partners with Catalent Cell and Gene Therapy to manufacture its flagship product, Zolgensma, at Catalent's 350,000 square feet commercial manufacturing center in Harmans, Maryland. Under the terms of this partnership, Novartis Gene Therapies is entitled to dedicated space at Catalent's manufacturing facility to manufacture Zolgensma.

30.     Novartis Gene Therapies maintains a collaborative relationship with Regenxbio, a Maryland-based corporation centered around the development and commercialization of gene therapies. Zolgensma, Novartis' flagship gene therapy for the treatment of spinal muscular atrophy, relies on Regenxbio's proprietary NAV technology and its adeno-associated virus (AAV) AAV9 vector. Novartis Gene Therapies also holds an exclusive, worldwide license from Regenxbio for any recombinant AAV vector in its intellectual property portfolio for the in vivo gene therapy treatment of spinal muscular atrophy.

31.     Novartis also has a number of employees, including marketing personnel and researchers, who are based out of Maryland, who conduct research in Maryland and who market the company's products to Maryland physicians. In December of 2020, Novartis had between 50 and 150 employees in Maryland. This substantial presence in Maryland continues to the present.

32.     As part of its marketing efforts to Maryland physicians, Novartis pays substantial sums to Maryland physicians. In 2022 alone, Novartis paid $82,910 in consulting fees to Maryland physicians and $10,265 to non-physician practitioners. Its parent company, Novartis AG, paid some $11,625 to Maryland physicians in the same period.

33.     In 2020, Novartis agreed to settle a lawsuit for $678 million brought by several states, including Maryland, over allegations of that Novartis violated federal False Claims Act and Anti-Kickback Statute by providing doctors with cash payments, recreational outings, lavish

meals, and expensive alcohol to induce them to prescribe Novartis cardiovascular and diabetes drugs. As part of the settlement, Novartis admitted and accepted responsibility for certain conduct alleged by the Government including a 2008 speaker program held in Pikesville, Maryland, with only one doctor in the audience in the audience for the speaker's presentation, at which it spent $448 per person on food and alcohol, in addition to the $1,000 honorarium payment provided to the speaker.

34.     Novartis (and Novartis Gene Therapies) go to such lengths to promote their products in Maryland because they sell substantial amounts of their products in Maryland.

35.     Novartis has further purposefully availed itself to this forum by commercializing for profit HeLa cells despite its knowledge that the cells were obtained in Baltimore County, Maryland, through the deeply unethical and unlawful conduct described in this complaint.

36.     Viatris recruits patients and conducts clinical trials in Maryland. According to clinicaltrials.gov, Viatris has conducted or is conducting 50 clinical trials with locations in Maryland. Viatris offers its "Viatris Excellence in Pharmacy Award" to students at University of Maryland School of Pharmacy. Mylan Pharmaceuticals has likewise conducted clinical trials in Maryland.

37.     According to a database maintained by the Drug Enforcement Administration, Mylan Pharmaceutical manufactured over 8.4 million opioid pain pills that were distributed in Maryland between 2006 and 2019.

38.     Since November 2021, Viatris has spent over $142,000 on lobbying efforts in Maryland. Viatris also partners with Comfort Cases, a 501(c)3 non-profit organization headquartered in Rockville, Maryland.

39.    Viatris has a number of employees, including marketing personnel and researchers, who are based out of Maryland, who conduct research in Maryland and who market the company's products to Maryland physicians.

40.    In 2022, Mylan Specialty, a subsidiary of Viatris, paid 149 doctors who practice in Maryland to advertise

41.    Viatris has further purposefully availed itself to this forum by commercializing for profit HeLa cells despite its knowledge that the cells were obtained in Baltimore County, Maryland, through the deeply unethical and unlawful conduct described in this complaint.

**FACTS**

42.    In 1951, the chair of gynecology at Johns Hopkins—Dr. Richard Wesley TeLinde—faced widespread criticism for his practice of frequently removing the cervix, uterus, and substantial portions of the vagina of patients with carcinoma in situ, a condition not believed to be deadly at the time.

43.    TeLinde believed that by showing that carcinoma in situ behaved similarly to other forms of cervical cancer that were known to be deadly in the laboratory, he would be able to prove his aggressive surgical techniques were justified, and thus repair his tarnished reputation. TeLinde thus proposed to Dr. George Gey, then head of tissue research at Johns Hopkins, that TeLinde would provide samples of cervical cancer, taken from his patients without their knowledge or consent to Gey, if Gey would use those samples in his research and attempt to cultivate those cells in a form that could survive in a laboratory.

44.    TeLinde's offer meshed well with Gey's research interests. Virtually all human cell samples at the time died quickly in laboratory conditions. Gey wanted to attempt to cultivate a cell line that would be able to survive indefinitely in a lab—an immortal cell line. Gey had little

understanding of why human cells died in laboratory conditions. He tried repeating the process of creating human cell samples that could survive in laboratory conditions over and over again—a process that required more and more samples. TeLinde's proposal of an endless supply of samples thus suited Gey perfectly, and he agreed to the deal.

45.     To get Gey samples, TeLinde directed the physicians under his supervision to take tissue samples from Black patients in Johns Hopkins' segregated wards who were suffering from cervical cancer. While treating Black women in racially segregated wards, the white physicians under TeLinde's supervision would cut away tissue samples from their patients' cervixes without their patients' knowledge or consent. As one physician acting under TeLinde's supervision callously observed, "Hopkins, with its large indigent [B]lack population, had no dearth of clinical material."

46.     This horrifying dehumanization of Black patients and abuse of trust sadly had all too much precedent in then-recent medical history. At the same time as TeLinde and Gey concocted their scheme, the U.S. Public Health Service, working with the Tuskegee Institute in Macon, Alabama, denied hundreds of Black men widely available treatment for syphilis to enable them to study how the disease progressed when untreated. By the time this abusive study was disclosed to the public in July 1972, 28 participants had died from syphilis, 100 more had passed away from related complications, at least 40 spouses had been diagnosed with it, and the disease had been passed to 19 children at birth.

47.     The list of abuses is long. Another example is the medical practice known as the "Mississippi Appendectomy" beginning in the 1920s. The Mississippi Appendectomy was the systematic forced sterilization of poor Black women without the women's knowledge or consent. Physicians performed the hysterectomies under the pretense of appendectomies in order to prevent

poor Black women from reproducing and to give young, inexperienced physicians the opportunity to practice the hysterectomy procedure. These sterilizations reflected a blatant disregard for basic human rights.

48.     Similarly, during the Second World War, the United States tested mustard gas and other chemical agents on Black men, and then threatened the soldiers who complained with prison time to keep them quiet. Too often, the history of medical experimentation in the United States has been the history of medical racism.

49.     In January 1951, Henrietta Lacks was diagnosed with cervical cancer at Johns Hopkins.

50.     Henrietta Lacks's treating physician—acting under TeLinde's supervision— recommended an aggressive course of treatment: inserting rods of radium, a radioactive substance, into her body. This treatment approach required that Mrs. Lacks be placed under general anesthesia—providing an opportunity for a surgeon working for TeLinde to collect the tissue samples from Mrs. Lacks. This procedure was also certain to render Mrs. Lacks infertile.

51.     Henrietta Lacks was not informed that Johns Hopkins planned to take samples of her cervix. She did not consent to this surgical procedure or any such sampling. Taking a tissue sample is not medically necessary to conduct radium treatment, nor was it common practice in radium treatment at the time. Mrs. Lacks was also not told that the radium treatment she would be subjected to would render her infertile.

52.     On February 5, 1951, while Henrietta Lacks was unconscious, a surgeon working under TeLinde's supervision cut two circular samples of tissue, each about three-quarters of an inch across, from her cervix. These samples were then given to Gey for experimentation.

53.     Gey then attempted, once again, to create a cell line that could survive in laboratory conditions. Gey's efforts in cultivating the HeLa cell line were not meaningfully different than his prior, failed efforts. Unknown to Gey, however—and for reasons that the scientific community would not come to understand until decades later—Mrs. Lacks's cells had unique properties that meant they were able to survive in laboratory conditions. Gey was finally able to create the immortal cell line he had craved.

54.     As Gey worked to cultivate the stolen cells, Henrietta Lacks died of cervical cancer on October 4, 1951. She was buried in an unmarked grave.

55.     Indeed, around the same time that Henrietta Lacks passed away, Gey appeared on television, holding a vial of Mrs. Lacks's cells, to present his purported contribution to the fight against cancer. Gey introduced to the world the first successfully grown "immortal" human cell line.

56.     Scientists all over the world were given HeLa cells for free to conduct their own studies. Because HeLa cells were the first human cells that could survive indefinitely in laboratory conditions, scientists were able to use them for medical research that might well not have been possible without them. In the decades that followed, the HeLa cell line became an essential resource for medical research in labs worldwide. HeLa cell tissue was used to test the first polio vaccine, to understand the effects of radiation on human cells, to develop treatment for sickle cell anemia, and in countless scientific papers.

57.     Despite the widespread use of HeLa cells, for decades, the facts surrounding the origin of the HeLa cell line were unknown. Gey and Johns Hopkins went to great lengths to keep the origins of the HeLa cell line secret. As a result, for decades, the global scientific and medical communities were unaware that the HeLa cell line was the product of the assault of Henrietta

Lacks. Indeed, for many years, even Henrietta Lacks's real name was not known to the public—Gey claimed the cells came from a person named Helen Lane, so as to conceal the cells' true origin.

58.     Nonetheless, even before it was generally known that HeLa cells were Mrs. Lacks's cells, upon information and belief, the scientific community knew that physicians at Johns Hopkins performed unconsented-to non-therapeutic medical experimentation on its Black patients and turned a blind eye to Johns Hopkins' unlawful and tortious conduct and complete breach of trust and confidence to its patients.

59.     In recent years, the origins of the HeLa cell line have become widely known in the scientific community. They have received mention in more than 2,700 academic articles discussing issues of patient consent and medical ethics.

60.     Novartis has publicly admitted that it is aware of the fact HeLa cells were taken from Henrietta Lacks without her consent. The company has an informational page on its corporate website that describes Novartis's "holistic commitment" "that embraces equity in health" and acknowledges that Henrietta Lacks, "cervical cancer cells were surreptitiously commercialized for research purposes without her knowledge." In a separate page, Patrice Matchaba, President of the Novartis US Foundation and Head of US Corporate Responsibility at Novartis, discusses racial healthcare gap in the US, noting "We know about Henrietta Lacks. We know the reasons for people of color not to trust the current healthcare system." Novartis has been aware of unjust and unethical HeLa cell line origin since it began using Ms. Lacks's genetic materials in the testing and developing patents and drugs.

61.     Despite their awareness of the origins of the HeLa cell line, Novartis made a decision to use Henrietta Lacks's genetic material for their own profit. Novartis has widely used HeLa cells to conduct pharmaceutical testing of its drugs. Famvir, a Novartis antiviral medication

used to treat infections caused by herpes viruses, was tested for their potential to cause unscheduled DNA synthesis in HeLa 83 cells. Novartis has generated billions of dollars from its own sales of Famvir in revenue before selling it to another pharmaceutical company. After Teva Pharmaceuticals launched a generic version of the drug, Novartis filed a patent infringement action and obtained an agreement in which Teva paid Novartis ongoing royalties from US sales.

62.     Novartis developed Kymriah (tisagenlecleucel), the first FDA-approved Chimeric Antigen Receptor T, (CAR-T) cell therapy. Novartis introduced Kymriah on the market at a price of $475,000 for a single infusion. Extensive research and patents underlying Novartis' development, approval, and refinement of CAR-T therapies like Kymriah.

63.     Zolgensma is a gene therapy developed by Novartis Gene Therapies, designed to treat spinal muscular atrophy (SMA), a severe and often fatal genetic disorder affecting infants and young children. Zolgensma is known for its high cost, being one of the most expensive drugs in the world. The price of a single treatment can exceed $2 million. Publicly available documents indicate that Zolgensma was tested in vitro on HeLa cells during its development. These documents reveal that HeLa cells were used to assess the efficacy and safety of the gene therapy. On information and belief, Novartis Gene Therapies has used HeLa cells in its medical research for other products.

64.     The Novartis corporate family holds hundreds of patents that were developed using Mrs. Lacks's genetic materials.

65.     Viatris' former CEO has publicly admitted that it is aware of the fact HeLa cells were taken from Henrietta Lacks without her consent. He posted online that "it is medically and scientifically fascinating how one woman's cells have been so pivotal in countless hashtag#research and contributed to the development of so many significant drugs…. The

experiences of people like Henrietta Lacks … continue to leave emotional wounds in the Black community in the United States." Viatrishas been aware of unjust and unethical HeLa cell line origin since it began using Ms. Lacks's genetic materials in the testing and developing

66.     Despite their awareness of the origins of the HeLa cell line, Viatris and Mylan Pharmaceuticals made a decision to use Henrietta Lacks's genetic material for their own profit. Mylan Pharmaceuticals has widely used HeLa cells to conduct pharmaceutical testing of its drugs. Denavir, formerly Mylan Pharmaceuticals's, now Viatris's antiviral medication used to treat cold sores caused by the herpes simplex virus, was tested for its potential to cause unscheduled DNA synthesis in HeLa S3 cells. Denavir cream generated $28 million in U.S. annual sales in 2021.

67.     Likewise, Mylan-Mirtazapine, developed by Mylan Pharmaceuticals and now sold by Viatris, is used for the treatment of major depressive disorder, and was tested for its potential to cause unscheduled DNA synthesis assay in HeLa cells. Mylan-Mirtazapine has generated millions of dollars in revenue. Mylan-Hydroxyurea is used with radiation for head and neck cancers, its mechanism of hindering DNA repair in irradiated cells was theorized through HeLa cell studies.

68.     The Novartis corporate family holds hundreds of patents that were developed using Mrs. Lacks's genetic materials. Similarly, Viatris holds patents that were developed using Mrs. Lacks's genetic materials.

70.     Novartis and Viatris have engaged in extensive research utilizing HeLa cells, which have significantly fueled their respective profits. The companies' reliance on these cells for critical research has led to the creation of several high-value pharmaceuticals and therapies. This dependence on HeLa cells has provided Defendants with a steady stream of innovations, driving substantial revenue growth and securing their positions as leaders in the pharmaceutical industry.

The use of HeLa cells has undeniably been a cornerstone of Defendants' research initiatives, underpinning their respective commercial successes.

71.     In other words, Defendants actively engage in endeavors aimed at profiting from the sale of products and services derived from Mrs. Lacks' cellular material, develop cellular products incorporating HeLa cells, and seek intellectual property rights on these products, staking a claim to the genetic material of Mrs. Lacks. Defendants have appropriated Mrs. Lacks's genetic material solely for their pecuniary gain, all without obtaining payment, permission, or any form of approval from the Lacks Estate or family.

72.     In recent years, Defendants have reaped substantial financial gains through the utilization of Ms. Lacks' genetic materials. At the same time, regrettably, Mrs. Lacks' Estate and her family have been unjustly deprived of any form of compensation by Novartis. These lucrative commercial endeavors were pursued despite the widespread publicity surrounding the origins of the HeLa cell line. Novartis was fully aware that the HeLa cells were wrongfully obtained from Mrs. Lacks, yet they consciously opted to exploit her body for their own financial benefit.

73.     Upon information and belief, due to the confidential nature of Defendants' drug development processes, it is highly likely that numerous other drugs were developed using HeLa cells. This widespread and undisclosed use of HeLa cells has contributed significantly to the companies' research and development efforts, resulting in various profitable products that owe their existence to the unauthorized use of Henrietta Lacks's cells.

74.     Because of Novartis' and Viatris' actions, Henrietta Lacks' children and grandchildren have been forced to live with the reality that the living tissue of their mother or grandmother is exploited for research purposes and profited from by powerful organizations

against her and her family's will. This robs the family of one of the most basic comforts any grieving person can ask for—the knowledge that a loved one's body has been treated with dignity.

75.     Beyond this harm, the far-reaching dispersion of Henrietta Lacks's tissue has engendered a disquieting reality: the widespread availability of Mrs. Lacks's genetic information—and, as a consequence, some of the most private information about Mrs. Lacks and her family has been exposed to the general public.

76.     In other words, Novartis's business is to commercialize Henrietta Lacks's cells—her living bodily tissue—without the consent of or providing compensation to Ms. Lacks's Estate. All the while, Novartis understands—indeed, acknowledges on its own website—that this genetic material was stolen from Ms. Lacks. Novartis's business is nothing more than a perpetuation of this theft.

## COUNT I

### For Unjust Enrichment

77.     Plaintiff incorporates ¶¶1-76 by reference.

78.     Novartis and Novartis Gene Therapies was, is and will continue to be unjustly enriched because it received and continues to receive a benefit from Henrietta Lacks every time it acquires, cultivates, tests, researches, sells, and receives payment from HeLa cells, understood it receives a benefit from Mrs. Lacks every time it acquires, cultivates, sells, and receives payment for newly-replicated HeLa cells, and does so in circumstances in which acceptance or retention of the benefit was, is, and will continue to be inequitable without payment or permission.

79.     Novartis's (and Novartis Gene Therapies's) receipt, cultivation (and continued cultivation), sale of, and receipt of payment for HeLa cell research was, is, and will continue to be inequitable without payment or permission because Mrs. Lacks's cells were obtained through breach of a relation of trust and confidence. HeLa cells are Mrs. Lacks's cells, taken by physicians

in whom she had placed her trust without her consent or knowledge and for no therapeutic purpose. Nor is there any indication that Novartis intends to stop its unjust cultivation and sale of HeLa cells.

80.     Novartis's (and Novartis Gene Therapies's) cultivation (and continued cultivation), sale of, and receipt of payment for HeLa cells was, is, and will continue to be inequitable without payment or permission because Mrs. Lacks's cells were obtained through the unlawful conduct described above.

81.     Novartis's receipt, cultivation (and continued cultivation), sale of, and receipt of payment for HeLa cells in perpetuity was, is, and will continue to be inequitable without payment or permission because of the totality of circumstances surrounding the acquisition, cultivation, and sale of HeLa cells.

82.     Novartis and Novartis Gene Therapies acted with knowledge of the underlying wrong to Henrietta Lacks or despite a known risk that the conduct in question violated the rights of Mrs. Lacks. Novartis and Novartis Gene Therapies is thus liable for its net profits achieved as the fruits of its unjust enrichment.

83.     Viatris and Mylan Pharmaceuticals were, are and will continue to be unjustly enriched because it received and continues to receive a benefit from Henrietta Lacks every time it acquires, cultivates, sells, and receives payment for newly-replicated HeLa cells, understood it receives a benefit from Mrs. Lacks every time it acquires, cultivates, sells, and receives payment for newly-replicated HeLa cells, and does so in circumstances in which acceptance or retention of the benefit was, is, and will continue to be inequitable without payment or permission.

84.     Viatris and Mylan Pharmaceuticals's cultivation (and continued cultivation), sale of, and receipt of payment for HeLa cell research was, is, and will continue to be inequitable

without payment or permission because Mrs. Lacks's cells were obtained through breach of a relation of trust and confidence. HeLa cells are Mrs. Lacks's cells, taken by physicians in whom she had placed her trust without her consent or knowledge and for no therapeutic purpose. Nor is there any indication that Viatris intends to stop its unjust cultivation and sale of HeLa cells.

85.     Viatris's cultivation (and continued cultivation), sale of, and receipt of payment for HeLa cells was, is, and will continue to be inequitable without payment or permission because Mrs. Lacks's cells were obtained through the unlawful conduct described above.

86.     Viatris's cultivation (and continued cultivation), sale of, and receipt of payment for HeLa cells in perpetuity was, is, and will continue to be inequitable without payment or permission because of the totality of circumstances surrounding the acquisition, cultivation, and sale of HeLa cells.

87.     Viatris and Mylan Pharmaceuticals acted with knowledge of the underlying wrong to Henrietta Lacks or despite a known risk that the conduct in question violated the rights of Mrs. Lacks. Viatris and Mylan Pharmaceuticals are thus liable for its net profits achieved as the fruits of its unjust enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court, after trial on the merits, grant the following relief and judgment:

A.      Order Novartis and Viatris to disgorge the full amount of its net profits obtained by commercializing the HeLa cell line to the Estate of Henrietta Lacks;

B.      Permanently enjoin Novartis and Viatris from using the HeLa cell line without the permission of the Estate of Henrietta Lacks;

C.      Impose a constructive trust in favor of the Estate of Henrietta Lacks on all HeLa cells possessed by Novartis and Viatris, and its acquisitions, all related intellectual property, and all proceeds related to use thereof;

D.      Award Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Award such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 5th  2024,

/s/ Kim Parker
Kim Parker, Esquire
Federal Bar No. 23894
LAW OFFICES OF KIM PARKER, P.A.
2123 Maryland Ave.
Baltimore, MD 21218
Telephone: 410-234-2621
Fax: 443-486-1691
kp@kimparkerlaw.com

Christopher A. Seeger*
Christopher L. Ayers*
Nigel P. Halliday*
Hillary Fidler*
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone: 212-584-0700
Fax: 212-584-0799
cseeger@seegerweiss.com
cayers@seegerweiss.com
nhalliday@seegerweiss.com
hfidler@seegerweiss.com

Ben Crump*
Nabeha Shaer*
BEN CRUMP LAW, PLLC
633 Pennsylvania Avenue, NW, Floor2
Washington D.C. 20004
Telephone: 860.922.3030
court@bencrump.com
nabeha@bencrump.com

ATTORNEYS FOR RON L. LACKS, PERSONAL
REPRESENTATIVE OF THE ESTATE OF HENRIETTA
LACKS
*PTO HAC VICE PENDING